ACCEPTED
15-24-00036-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
1/10/2025 4:11 PM
CHRISTOPHER A. PRINE
CLERK

# TAB 4

Substantial Evidence Affidavit Presented to TCEQ by Max Midstream (A.R. 55 at 59-66)

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
1/10/2025 4:11:58 PM
CHRISTOPHER A. PRINE
Clerk

STATE OF ARKANSAS §
COUNTY OF WASHINGTON §

BEFORE ME, the undersigned authority, on this day personally appeared Lucy Fraiser, who after being duly sworn upon her oath stated as follows:

1.     My name is Lucy Fraiser.  I am over 21 years of age, am of sound mind, and am fully competent to make this affidavit.  Each and every statement contained in this affidavit is based upon my personal knowledge, and each and every statement is true and correct.

2.     I am a toxicologist. I perform air quality health and welfare evaluations, provide litigation and regulatory support and prepare soil/water human health and ecological risk assessments.  I formed Lucy Fraiser Toxicology Consulting LLC in July 2017, which is a toxicology consulting firm.

I have been retained on behalf of Max Midstream, LLC ("*Max Midstream*") to conduct a public health and welfare effects evaluation related to the potential for health and/or welfare effects from maximum allowable emissions from the expansion of the Seahawk Terminal ("*Seahawk Terminal*") proposed by Max Midstream's application for Texas Commission on Environmental Quality ("*TCEQ*") Permit Application No. 162941 ("*Application*").  I have reviewed the following documents, as well as data regarding the Application provided to me by Trinity Consultants, which prepared the air dispersion modeling for the Application:

TCEQ's Air Quality Analysis Audit dated January 26, 2021 ("*Modeling Audit*");

TCEQ Modeling Audit dated March 4, 2021 ("*Supplemental Modeling Audit*");

Affidavit of Joe Kupper, Manager of the Austin Office for Trinity Consultants, in the same TCEQ Docket Number listed above for the Application ("*Kupper Affidavit*");

Affidavit of Tony Nguyen, Senior Vice-President for Global Innovation and Technical Services for Max Midstream, in the same TCEQ Docket Number listed above for the Application ("*Nguyen Affidavit*");

Comments and Hearing Requests on the Application submitted on November 12, 2020, June 4, 2021, August 17, 2021, and January 10, 2022 by Diane Wilson, San Antonio Bay Estuarine Waterkeeper, Texas Rio Grande Legal Aid, and Environmental Integrity Project ("*Group Hearing Requests*");

TCEQ's *Modeling and Effects Applicability Review: How to Determine the Scope of Modeling and Effects Review for Air Permits* (APDG 5874) (2018) ("*MERA*");

2474029.v1

TCEQ's *Guidelines to Develop Toxicity Factors* (RG-442) (September 2015);

TCEQ's ESLs for crude oil, < 1% benzene, and fuel oil no. 2, available in the TCEQ Texas Air Monitoring Information System Toxicity Factor Database at https://www17.tceq.texas.gov/tamis/index.cfm;

TCEQ's Effects Evaluation Procedure: Marine Vessels dated (August, 2001) (*"Extended Tier II Guidance for Marine Terminals"* at https://www.tceq.texas.gov/searchpage?q=TCEQ%E2%80%99s+Effects+Evaluation+Pro cedure%3A+Marine+Vessels+dated+August%2C+2001&btnG=TCEQ+Search.

These are the same type of documents that I have reviewed, or any toxicologist would be expected to review, and rely upon in conducting a public health and welfare effects evaluation.

4.    I received a Ph.D. in Toxicology in 1992 from the University of Texas at Austin and a B.A. Degree in Psychology from the University of Texas at Austin in 1984. I am a Diplomate of the American Board of Toxicology (*"DABT"*). The DABT certification is a globally-recognized credential in toxicology. The DABT certification is a certification by the American Board of Toxicology (*"ABT"*), which is the largest professional toxicology credentialing organization in the world. The DABT certification represents competency and commitment to human health and environmental sciences. Becoming certified by the ABT requires a combination of higher education and experience, with rigorous certification (testing) and recertification processes. I am also a member of the American College of Toxicology. I have conducted and managed hundreds of multi-pathway exposure and human health risk assessments and risk-based corrective action evaluations over my 32-year career. Early in my career, I worked in the Toxicology Division of the Texas Natural Resource Conservation Commission (*"TNRCC"*), the predecessor agency to the TCEQ. After leaving the TNRCC in 1998, I worked for a number of different consulting firms as a toxicologist. I started Lucy Fraiser Toxicology Consulting LLC in July 2017. While I work with all environmental media, I specialize in air quality public health and welfare effects evaluations. I have performed these evaluations for many industrial source types and types of pollutants. I have extensive experience performing public health and welfare effects evaluations related to air quality permit applications submitted to the TCEQ and its predecessor agency, the TNRCC. I have conducted health and welfare evaluations for proposed and/or existing emissions from dozens of industrial facilities, including hazardous waste combustion facilities, refineries, electricity generating units, chemical plants, concrete batch plants, rock crushers, cement kilns, and smelters (copper and lead). I have also performed numerous other air quality evaluations in other states not directly related to the air permitting process. I have been qualified as an expert, been deposed, and have provided expert testimony in contested case hearings, federal civil suits, and state toxic tort litigation involving potential effects of air emissions on public health and welfare on numerous occasions.

5.    Applicants for TCEQ air permit applications use air dispersion modeling to predict concentrations of the pollutants from the proposed facilities at "receptors," which TCEQ modeling guidance defines as locations "where the public could be exposed to an air contaminant in the ambient air.". Air dispersion models predict movement of contaminants in the atmosphere and provide conservative estimates (i.e., overestimates) of air pollutant concentrations at different

2474029.v1

distances and directions from the emissions source. Exposure occurs when local populations come into contact with pollutants from an emissions release. Therefore, conservatively estimated air concentrations from air dispersion modeling are routinely used to evaluate potential exposures by providing conservatively estimated air concentrations (i.e., overestimated by comparison to actual expected exposure levels) at different locations. The concentration of a pollutant to which a member of the public is potentially exposed is critical to determining whether adverse health or welfare effects will occur. Toxicologists in TCEQ's Toxicology Division use the results from the air dispersion modeling in their toxicological evaluations of the effects of proposed emissions. The objectives of the analysis are to: 1) establish off-property ground-level concentrations ("*GLCs*") of contaminants resulting from proposed and/or existing emissions; and 2) evaluate these GLCs for their potential to cause adverse health or welfare effects. TCEQ's effects evaluation process, which relies on air dispersion modeling results, includes three areas of review.

6.      The first TCEQ effects evaluation looks at constituents for which the U.S. Environmental Protection Agency has established a National Ambient Air Quality Standard ("*NAAQS*"), also known as "criteria pollutants." In the State NAAQS Analysis, proposed emissions of criteria pollutants from the project are modeled to estimate maximum ground-level concentrations ("*GLC_{max}*"), with the objective of determining whether the project has the potential to cause or contribute to an exceedance of the NAAQS. EPA establishes each NAAQS at a level that is protective of public health and welfare with an adequate Margin of Safety ("*MOS*"). Employing conservative measures in deriving the NAAQS helps EPA to ensure that there is an adequate MOS between exposure concentrations associated with adverse health/welfare effects and the NAAQS. According to the TCEQ's review of the air dispersion modeling associated with the Application, which is included in the Modeling Audit:

   a.   As indicated in the table below, the $GLC_{max}$ for PM$_{10}$ (24-hr), PM$_{2.5}$ (Annual), NO$_2$ (Annual), CO (1-hr) and CO (8-hr) were all below the *de minimis* level, so no further evaluation was warranted.

| Pollutant | Averaging Time | GLCmax (µg/m³) | De Minimis (µg/m³) |
|-----------|----------------|----------------|---------------------|
| PM$_{10}$ | 24-hr | 2 | 5 |
| PM$_{2.5}$ | Annual | 0.1 | 0.2 |
| NO$_2$ | Annual | 0.8 | 1 |
| CO | 1-hr | 89 | 2000 |
| CO | 8-hr | 43 | 500 |

   Thus, the highest modeled criteria pollutant concentrations from proposed Seahawk Terminal sources at or beyond the fence line were below the *de minimis* NAAQS, otherwise known as Significant Impact Levels ("*SILs*"), for PM$_{10}$ (24-hr), PM$_{2.5}$

2474029.v1

(Annual), NO2 (Annual), CO (1-hr) and CO (8-hr). Since the SILs are set at a small fraction of the health and welfare-protective NAAQS, these criteria pollutants are not expected to pose a health or welfare threat.

b. For the NAAQS pollutants for which the $GLC_{max}$ was above the *de minimis* level, SO2 (1-hr), SO2 (3-hr), PM2.5 (24-hr), and NO2 (1-hr), an additional evaluation was conducted. However, based on the additional evaluation summarized in the Modeling Audit, which is summarized in the table below, the $GLC_{max}$ plus estimated background levels for each of those NAAQS pollutants was only a fraction or a very small fraction of the NAAQS standard.

| Pollutant | Averaging Time | GLCmax ($\mu g/m^3$) | Background ($\mu g/m^3$) | Total Conc. = [Background + GLCmax] ($\mu g/m^3$) | Standard ($\mu g/m^3$) |
|---|---|---|---|---|---|
| SO2 | 1-hr | 31 | 15 | 46 | 196 |
| SO2 | 3-hr | 30 | 25 | 55 | 1300 |
| PM2.5 | 24-hr | 1 | 23 | 24 | 35 |
| NO2 | 1-hr | 42 | 85 | 127 | 188 |

Thus, total concentrations of SO2 (1-hr), SO2 (3-hr), PM2.5 (24-hr), and NO2 (1-hr), were each well below their corresponding primary and secondary NAAQS, which included modeled concentrations from the Seahawk Terminal and ambient monitored background concentrations within an extended area. Since the NAAQS are conservatively designed to protect public health and welfare and include a MOS (margin of safety), these criteria pollutants are also not be expected to pose a health or welfare threat.

7. Next, the second TCEQ effects evaluation is a State Property Line Standard analysis completed for sulfur compounds in which measured or modeled $GLC_{max}$ are compared to TCEQ-derived State Property Line Standards in addition to the federal NAAQS. The Modeling Audit indicates that the $GLC_{max}$ for each sulfur compound included in the State Property Line Standards, which are included in the table below, are well below the State Property Line Standards.

2474029.v1

| Pollutant | Averaging Time | GLCmax (µg/m³) | Standard (µg/m³) |
|:---:|:---:|:---:|:---:|
| SO₂ | 1-hr | 140 | 1021 |
| H₂S | 1-hr | 14 | 108 (If property is residential, recreational, business, or commercial) |
| H₂S | 1-hr | 30 | 162 (If property is not residential, recreational, business, or commercial) |

Therefore, hourly $GLC_{max}$ for $SO_2$ and $H_2S$ comply with the State Property Line Standards established by the TCEQ. It is my opinion that the hourly $GLC_{max}$ for $SO_2$ and $H_2S$ do not pose a health or welfare threat.

8. The third TCEQ effects evaluation involves a public health and welfare effects evaluation for constituents lacking a NAAQS or TCEQ State Property Line Standards, and for these constituents, an evaluation is conducted in accordance with appendix D of TCEQ's guidance entitled *Modeling and Effects Applicability Review: How to Determine the Scope of Modeling and Effects Review for Air Permits* (APDG 5874) (2018) ("*MERA*"). In the MERA evaluation, modeled $GLC_{max}$ are compared to TCEQ-derived Effects Screening Levels ("*ESLs*"), which are health and/or welfare-based screening levels (not promulgated standards, such as the NAAQS and State Property Line Standards) used in the TCEQ permitting process. ESLs are only guidelines or screening levels that TCEQ sets at concentrations that correspond to a "no significant risk level." Therefore, if predicted airborne levels of a compound exceed the relevant ESL, adverse health or welfare effects would not necessarily be expected to occur, but a more in-depth review would be triggered. Because they are designed to be preventative in nature, ESLs are set at levels: 1) below the threshold for health effects; 2) corresponding to an insignificant risk; or 3) where odor nuisance or vegetative effects are unlikely. Setting ESLs at these conservative levels ensures that public health and welfare are protected by incorporating a MOS. TCEQ's MERA guidance establishes a process for determining the scope of air modeling and the extent of the health effects review necessary. Steps 1 through 7 of the MERA consist of conservative procedures used by air permitting engineers to evaluate the potential for health effects of air contaminants. The Toxicology Effects Evaluation Procedure located in Appendix D of the MERA is based on a three-tiered approach, with Tiers I, II, and III representing progressively more complex levels of review.

Tier I involves determining if the off-property $GLC_{max}$ is below the ESL. If the $GLC_{max}$ is below the ESL, adverse health/welfare effects are not expected. If the $GLC_{max}$ is above the ESL, the analysis continues to the next tier. Tier II entails determining if the $GLC_{max}$ occurs on industrial property. If the $GLC_{max}$ occurs on industrial property and is less than or equal to two times the ESL, adverse health and welfare effects are not expected to occur. If the $GLC_{max}$ occurs on non-industrial property ("*$GLC_{ni}$*") and the $GLC_{ni}$ is less than the ESL, adverse health/welfare effects are not expected to occur. If either the $GLC_{max}$ on industrial property is greater than two times the

2474029.v1

ESL or the GLCni is greater than the ESL, the analysis continues to the next tier. However, if the hourly GLCmax exceeds two times the ESL for 24 hours or less, a Tier III evaluation need not be conducted according to TCEQ'S Extended Tier II Guidance for Marine Terminals provided in *"Effects Evaluation Procedure: Marine Vessels"*. Limiting the number of hours that an ESL can be exceeded by a particular magnitude reduces the likelihood of repeated exposure to concentrations above the ESL (which are set at levels that do not pose a significant risk) and further reduces the likelihood of health or welfare effects. Short-term ESLs are designed to be protective of more than a single 1-hour exposure and, therefore, as long as the frequency of those exceedances is limited, adverse health and welfare effects are not expected. A case-by-case Tier III Analysis is only conducted by TCEQ toxicologists for compounds that do not satisfy Tier I or Tier II criteria.

For constituents eliminated during the MERA process or in Tier I or II of the Toxicology Effects Evaluation Procedure, steps which only require comparing modeled air concentrations (i.e., GLCmax and GLCni) to ESLs (or multiples of the ESL), there is no need for a more detailed review by the Toxicology Division. In other words, the MERA process and Tier I and II of the Toxicology Effects Evaluation Procedure represent screening procedures by which a permit applicant can demonstrate that emissions of non-criteria pollutants from a facility will be protective of the public's health and welfare.

As reflected in the table below, the Modeling Audit shows that, except for crude oil and crude condensate (both 1-hr GLCmax), modeled concentrations for constituents to which the Public Health and Welfare Effects Evaluation applies are well below the applicable ESL. Thus, because concentrations of crude oil (annual), crude condensate (annual), and diesel fuel (1-hr) are modeled to be well below the ESL, no health or welfare impacts are expected.

| Pollutant | CAS# | Averaging Time | GLCmax (µg/m³) | GLCmax Location | GLCni (µg/m³) | GLCni Location | ESL (µg/m³) |
|---|---|---|---|---|---|---|---|
| Crude oil, <1% benzene | - | 1-hr | 8782 | Eastern Property Line | 1718 | 972m East | 3500 |
| Crude oil, <1% benzene | - | Annual | 16 | Northern Property Line | 7 | 78m West | 350 |
| Crude condensate | - | 1-hr | 8782 | Eastern Property Line | 1718 | 972m East | 3500 |
| Crude condensate | - | Annual | 16 | Northern Property Line | 7 | 78m West | 350 |
| Diesel fuel | 68334-30-5 | 1-hr | 15 | Eastern Property Line | 15 | Northern Property Line | 1000 |

| Pollutant | Averaging Time | 2 X ESL GLCmax |
|---|---|---|
| Crude oil, | 1-hr | 9 |
| Crude condensate | 1-hr | 9 |

Although the modeled GLCmax for crude oil and crude condensate (both 1-hr) are above the respective ESLs, no additional MERA evaluation was required or needed because, as indicated in in the table above, there were only 9 hours out of 8,760 hours (one year) modeled where the GLCmax concentration exceeded two times the ESL. As explained above, the Extended Tier II

2474029.v1

Guidance for Marine Terminals (TCEQ, 2001) provides that no further justification is generally needed when this number is less than 24 hours.

Thus, the proposed emissions from the Seahawk Terminal expansion do not pose an adverse health or welfare effect because of the small magnitude of the modeled $GLC_{max}$ and the highly conservative nature of the ESL. The first layer of conservatism in the Health and Welfare Effects Evaluation occurs in the air dispersion modeling, which is conducted to estimate *worst-case* potential exposure levels (i.e., the maximum predicted concentration over a certain number of years of meteorological data from the worst-case tank/dock for Maintenance Startup Shutdown (MSS) emissions and annual emissions and maximum rates from all tanks and docks simultaneously for routine emissions). The modeled air concentrations used in the public health and welfare effects analysis are also highly conservative because the air dispersion model is conservative by design.

Moreover, there is considerable conservatism built into the ESLs themselves. Specifically, the ESLs for crude oil and crude condensate were derived by dividing the National Institute of Occupational Safety & Health (NIOSH) Recommended Exposure Level (REL), the limit below which no worker harm is expected, by conservative safety factors (100 for short-term ESL and 1,000 for long-term ESL). The safety factor of 100 used in deriving the short-term ESL more than accounts for the 3-fold higher exposure to ambient air experienced by the general public (24-hours/day, 7 days/week) by comparison to worker exposure to workplace air (8- to 10-hours/day, 5 days/week). Similarly, the safety factor of 1,000 more than accounts for the 6-fold higher long-term exposure to ambient air experienced by the general public (24-hours/day, 7 days/week for 70 years) by comparison to workplace air exposure (8- to 10-hours/day, 5 days/week for 40 years). Moreover, the crude oil REL and the fuel oil no. 2 Threshold Limit Value (TLV) that form the initial bases for the ESLs were highly conservative (i.e., health protective) to start with.

Further, the $GLC_{max}$ for crude oil and for crude condensate (both 1-hr) were approximately 2.5 times the ESLs, and the exceedance occurred just beyond the proposed fence line at the northeastern boundary in a heavily industrialized area, where public exposure is expected to be minimal. Therefore, it is my opinion that these constituents, as well as other constituents modeled for the health and welfare effects evaluation, do not pose a health or welfare threat.

9. As explained above, the maximum levels of pollutants to be authorized by the Application are a fraction of the state and federal standards and the state ESLs, which are conservatively designed to be protective of public health and welfare. The only exceptions are crude oil and crude condensate (both 1-hr), which would only be present at levels above the ESL in an industrialized area just beyond the fence line and were subject to additional review that indicated that emissions from crude oil and crude oil condensate are not expected to pose a public health or welfare threat.

10. Based on the mapping and property owner's list of persons and entities that own property within 1.5 miles of the Seahawk Terminal expansion project (as described in the Kupper Affidavit), no person resides within 1 mile of the Seahawk Terminal. Impacts on public health

2474029.v1

and welfare further than 1 mile would be indiscernible. At greater distances than 1 mile from an emissions source, potential impacts are expected to be even less.

11. Based on my review of the Group Hearing Requests, all of the locations described as being visited by Ms. Wilson are further than 1 mile from the Seahawk Terminal, except for Formosa Outfalls 011 and 013 at the locations described in the Group Hearing Requests. Based on the modeling and on my evaluation as described above, Ms. Wilson would not experience impacts from visiting the locations described in the Group Hearing Requests that are further than 1 mile from the Seahawk Terminal any differently than anyone else who visits places further than 1 mile from the Seahawk Terminal, and such impacts would be indiscernible. Even if Formosa Outfalls 011 or 013 are in the locations described in the Group Hearing Requests, the only locations described as being closer than 1 mile, I would not expect Ms. Wilson to experience discernible health impacts from her visits. Exposure by itself will not result in possible negative effects unless the exposure is of sufficient magnitude, duration, and frequency to cause impacts. Given the modeled concentrations (provided by Joe Kupper) at the locations of Formosa Outfalls 011 or 013, as described in the Group Hearing Requests from the Seahawk Terminal, and given the infrequency and short duration during which the Group Hearing Requests says Ms. Wilson has been present there (3 times in 4 months), I would not expect discernible impacts from any pollutant for which authorization is requested by the Application.

12. The Nguyen Affidavit, which I have reviewed, identifies the location of Formosa Outfalls 011 and 013 based on mapping provided therein, that are different from the locations of those outfalls as described in the Group Hearing Requests. However, my conclusions stated above are the same regardless of whether those outfalls are located as described in the Group Hearing Requests or as described in the Nguyen Affidavit.

Further affiant sayeth not."

_____ Fraiser
Lucy Fraiser
Fraiser Toxicology Consulting, LLC

This instrument was acknowledged before me, the undersigned authority, this 3rd day of

March 2022, by Lucy Fraiser, Fraiser Toxicology Consulting, LLC, on behalf of said company.

ALEXIS TAVARES
BENTON COUNTY
NOTARY PUBLIC – ARKANSAS
My Commission Expires Aug. 31, 2028
Commission No. 12705010

Notary Public in and for the State of Arkansas

2474029.v1

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kim McBride on behalf of Derek Seal
Bar No. 797404
kmcbride@mcginnislaw.com
Envelope ID: 96098837
Filing Code Description: Exhibits - Exempt
Filing Description: Appellants' Exhibits For Oral Argument
Status as of 1/10/2025 4:37 PM CST

Associated Case Party: Calhoun Port Authority

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Michael Woodward | 21979300 | mwoodward@hslawmail.com | 1/10/2025 4:11:58 PM | SENT |
| Barton Hejny | 24082231 | bhejny@hslawmail.com | 1/10/2025 4:11:58 PM | SENT |
| Petrus J.Wassdorf | | pwassdorf@hslawmail.com | 1/10/2025 4:11:58 PM | SENT |
| Alan Sanders | | alan.sanders@dinsmore.com | 1/10/2025 4:11:58 PM | SENT |

Associated Case Party: Texas Oil & Gas Association

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Samia Broadaway | 24088322 | samia.broadaway@bakerbotts.com | 1/10/2025 4:11:58 PM | SENT |
| Beau Carter | | beau.carter@bakerbotts.com | 1/10/2025 4:11:58 PM | SENT |

Associated Case Party: Max Midstream, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Derek Seal | | dseal@mcginnislaw.com | 1/10/2025 4:11:58 PM | SENT |
| Jordan Mullins | | jmullins@mcginnislaw.com | 1/10/2025 4:11:58 PM | SENT |
| April Lucas | | alucas@mcginnislaw.com | 1/10/2025 4:11:58 PM | SENT |
| Kim McBride | | kmcbride@mcginnislaw.com | 1/10/2025 4:11:58 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Colton Halter | | colton.halter@oag.texas.gov | 1/10/2025 4:11:58 PM | SENT |
| Debbie Trevino | | debbie.trevino@dinsmore.com | 1/10/2025 4:11:58 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kim McBride on behalf of Derek Seal
Bar No. 797404
kmcbride@mcginnislaw.com
Envelope ID: 96098837
Filing Code Description: Exhibits - Exempt
Filing Description: Appellants' Exhibits For Oral Argument
Status as of 1/10/2025 4:37 PM CST

Associated Case Party: Texas Commission on Environmental Quality

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Erin Snody | | erin.snody@oag.texas.gov | 1/10/2025 4:11:58 PM | SENT |
| Annalisa Guartuche | | annalisa.guartuche@oag.texas.gov | 1/10/2025 4:11:58 PM | SENT |
| Sara Ferris | | sara.ferris@oag.texas.gov | 1/10/2025 4:11:58 PM | SENT |
| David Laurent | | david.laurent@oag.texas.gov | 1/10/2025 4:11:58 PM | SENT |

Associated Case Party: San Antonio Bay Estuarine Waterkeeper

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Erin Gaines | | egaines@earthjustice.org | 1/10/2025 4:11:58 PM | SENT |
| Michelle Carlos | | mcarlos@earthjustice.org | 1/10/2025 4:11:58 PM | SENT |
| Claire Huebler | | chuebler@earthjustice.org | 1/10/2025 4:11:58 PM | SENT |
| Ilan Levin | | ilevin@environmentalintegrity.org | 1/10/2025 4:11:58 PM | SENT |

Associated Case Party: Texas Campaign for the Environment

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Erin Gaines | | egaines@earthjustice.org | 1/10/2025 4:11:58 PM | SENT |
| Michelle Carlos | | mcarlos@earthjustice.org | 1/10/2025 4:11:58 PM | SENT |
| Claire Huebler | | chuebler@earthjustice.org | 1/10/2025 4:11:58 PM | SENT |
| Ilan Levin | | ilevin@environmentalintegrity.org | 1/10/2025 4:11:58 PM | SENT |

Associated Case Party: S.DianeWilson

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Kim McBride on behalf of Derek Seal
Bar No. 797404
kmcbride@mcginnislaw.com
Envelope ID: 96098837
Filing Code Description: Exhibits - Exempt
Filing Description: Appellants' Exhibits For Oral Argument
Status as of 1/10/2025 4:37 PM CST

Associated Case Party: S.DianeWilson

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Ethan Siegel | | esiegel@trla.org | 1/10/2025 4:11:58 PM | SENT |
| Karis Adams | | karisadams@trla.org | 1/10/2025 4:11:58 PM | SENT |